Thank you, Your Honor. Mr. Chief Judge, and may it please the Court, David Nevin on behalf of Mr. Leavitt. And, Your Honors, I will say that I see these two issues as being intertwined. I can speak to the testing issue separately if the Court prefers that, but to me they're all... Well, if you want, we can just consolidate them and just make it 40 minutes aside on both cases, and you can use the time as you wish. That would be great, thank you. Would you rather do that? Yes, sir. Well, we already set the clock to 40, but remember you've got to go through. And I guess you should take it as an indication of what we think are the more difficult issues in budgeting your time. Yes, sir, thank you. Is there an objection from the other side? No, Your Honor. Okay, thank you. Then you may proceed. Thanks, Your Honor. Mr. Leavitt's to be executed on Tuesday. He's got two very important issues that would have... that there's at least a reasonable likelihood would have changed the outcome of the case if they'd been brought to the attention of the jury, and they weren't. And we've never had a chance to raise that issue, both those issues, as matters of the ineffectiveness of trial counsel. This is a 60B issue, right? Yes, sir. And you say the two are intertwined. I mean, I wasn't clear from the briefing, perhaps you can elucidate. My understanding was that the... I call it DNA testing, but it's really not just DNA. It's testing in general, right? Yes, sir. That the testing was largely, or primarily, or perhaps exclusively designed to support clemency petition rather than anything pending now before the... It's the court by way of habeas. When I say now, I mean in this case. Yes, sir. And I guess I would say that my understanding of it, and counsel's and my understanding of it is that it was really both. It certainly went to clemency, but it also goes to the 60B motion because the serology evidence is important in the 60B motion as well, and our concern is that with proper testing of the evidence, and I refer primarily to a pair of corduroy shorts, brown corduroy shorts. With proper testing of that, we could unravel this issue of the mixing, quote, unquote, of the blood, or by contrast, the underlay and overlay of the two depositions of blood. That's a critical issue, and that's one of the things that we certainly wanted to get at. I have a couple of questions about that. One is, at some point, I think in one of the Ninth Circuit opinions, it seemed to say that there was no blood left to be tested, that one of the challenges was that they had exhausted the blood. So what are we testing? Well, my co-counsel, Mr. Parnes, went to Blackfoot in April, met with the Bingham County prosecuting attorney, in other words, not representatives of the AG's office, and found that the evidence was still there, and had an agreement at that time that it could be tested. So even though we were told in the history of this case that there was no blood left to be tested, there is? There is. It appears, in fact, that there is blood left to be tested. And as I say... Secondly, what exactly do you mean by we haven't had a chance to erase this? In the post-conviction proceedings, there was extensive... I'm not talking about the DNA now, but in terms of this question of Dr. Blake and whether his testimony should have been put on or not, there was testimony in state pre-trial proceedings quite extensively about that question, right? And it was, at least in one footnote, decided in one of the Ninth Circuit cases. So in what sense has it not been... What exactly is it that you weren't able to erase that you're trying to erase now? Exactly. We're trying to erase the failure of trial counsel to destroy, defeat, overwhelm the argument of mixing. And this was actually not presented to the state courts, by which I mean this. I read the transcript of the post-conviction relief proceeding on April 23rd of 1987 again, and you see that counsel asks questions about this issue but does not follow up on them. So he has, I'm talking post-conviction counsel now, has trial counsel on the witness stand and is cross-examining him and says to him... His testimony would in some ways corroborate the testimony of Ms. Bradley, the state's expert. And so post-conviction counsel says to him, but what about this issue of the mixing of the blood? And Mr. Kohler, trial counsel, says, I don't understand what you're asking. And there is some colloquy with the court, and post-conviction counsel never goes back to that issue. He never presses that issue, never actually asks and demands that trial counsel answer that question. And then, so it's never... Well, it went on. They did ask him whether, did you go over this particular thing, and he said, well, I don't remember that specifically, but we went over everything, so I'm sure we did go over it. Right. And then what? Were you procedurally, at what point were you procedurally defaulted from raising this question? I think we were procedurally defaulted probably at that point, because now... And so the trial court didn't decide it, but the Ninth Circuit did eventually decide it, no? Well, respectfully, Your Honor, I would say, well, yes, I know what footnote 4 says. But the issue was, in fact, defaulted in state court. And so respectfully, I think that the factual predicate... Was it treated as defaulted? Well, it wasn't treated at all, by which I mean it was never argued to the trial judge on post-conviction. Yeah, but I'm talking in the federal habeas, was it treated as defaulted? Yes. This was part of Claim 9, and Judge Windmill defaulted it in 1996 and ruled that it was procedurally defaulted. And so when we get around to questioning post-conviction counsel on deposition in 2006, we don't even approach these issues with him, because they're not on the table anymore. They're gone. And so no one has ever gotten to the bottom of these questions and asked counsel, you know, why didn't you address these issues? Was this a tactical choice? And if so, what possible tactical choice would have supported this? And so it comes in footnote 40. There's a sentence or two in which the court rules that it's been defaulted on the merits or that it loses on the merits, excuse me. Well, how did we decide it was decided on the merits if it was defaulted? Well, I don't know, Your Honor. Presumably because we didn't treat it as defaulted. See, that's what I'm having difficulty with. In other words, it ultimately was not in fact treated as defaulted. Well, it was treated as defaulted in the district court, and so it was never briefed or raised in the district court, never argued, never presented. No discovery was done on it in the district court. We didn't argue it when we came to the Ninth Circuit, and we never were asked to address this question. It appears as a ruling on the merits in this footnote for the first time. And we had taken it that it was defaulted because Judge Windmill had ruled on this. There's a huge amount of inquiry that would need to be done underneath this issue in order to address it on the merits. And, you know, footnote 40 says both claims do lose on the merit as a defendant's disagreement with his trial counsel's tactical decisions cannot form the basis for an effective assistance claim. And I went back over the record recently in the hopes of unraveling that because there was some testimony. Mr. Levitt, the petitioner, testified at the post-conviction relief proceeding in April of 1987 that he had asked his lawyer to do certain things, and his lawyer had not done them. So there was an issue of Mr. Levitt disagreeing with trial counsel, and the Idaho Supreme Court refers to that in its appellate decision in 1989. But this issue was not one of those issues. This was never raised as one of those issues that Mr. Levitt disagreed with his trial counsel on. If we get beyond that, you have to raise a substantial issue. And I'm having trouble with that aspect. It's not just arguable. You have to raise it. And I'm still not getting how this is substantial. Assuming the lawyer should have done and didn't do it, how is this substantial? I don't even understand the theory of the blood mixing as to what could have been argued and what's the best that could be made of it. Yes, sir. It was a circumstantial evidence case. Mr. Levitt said that he had been he said that his blood would be there, but that it had been placed there a week or so before the time that she was thought to have been murdered. And so the question is, and, you know, I mean, if blood falls on a surface today and then a week later additional blood falls on top of it, that blood is going to have dried. The blood is going to overlay and underlay. Those two blood depositions are going to overlay and underlay each other. They're not going to have mixed. But if There's no way of telling how long between the overlay and the underlay. It could have happened at the same time, right? Well, Your Honor, The same session. No, I don't believe that's true. Because the testimony at trial was, well, the testimony was equivocal, but it became, it was turned into an argument in support of the proposition that they were mixed and that they would have had to have been liquid at the same time because they were mixed. And this reference to mixed But I think what Judge Kaczynski is saying is that even if they weren't mixed, they still could have been deposited at the same time, or at least there's no evidence to the contrary. Well, this is part, this is, we've never been, we've never been able to develop this. But that wasn't in Blake's report, right? No. The answer to that question was not in Blake's report. Blake's report only contained the reference to it being underlay or overlaid as opposed to being mixed. But if we believe that if we're able to develop this, that we can demonstrate some information about timing, that we can say something, because there are breakdown rates that apply to blood, and it's possible that we can speak to the time in question. But I'm still not sure I understand. So let's say we give you that, that you can establish that one happened before the other, and maybe even at a different time. I mean, he could have been there, shed his blood, come back a week later, and stabbed her. Yes. There's nothing about this that precludes, it's not like saying, oh, we found his blood at another location at the time of the crime, right? Correct. He could have been there both times. It's logically possible. But your point, as I understand it, is that it was a very strong part of the evidence against him that they were mixed. You know, honestly, Your Honor, it has been, it was a central part of the prosecutor's closing argument. He said it with a great deal of drama and purpose. It was the last thing he argued, at least before the link in the chain argument. And it was regarded as conclusive proof of the case. That's how the prosecutor argued it. And that's how the Idaho Supreme Court saw it, and that's how Judge Windmill saw it in a couple of opinions in the district court. That's how this court saw it. The issue that you raised in the federal habeas with regard to this, way back, was it that the trial counsel should have done something different in investigating the serology or that he should have put on Dr. Blake? Both. But the second part, that he should have done more. But have you ever put in a declaration from another serologist now, contesting either in state court or in federal court or tried to, demonstrating what could have been shown? We, this is what we, this is why we filed a Rule 60B motion. But even now you haven't done that, right? That's correct. You still haven't put in a declaration from anybody saying, if I were able to investigate this I might be able to show X, Y, and Z. Yes, Your Honor, that's correct. We have not. That was, honestly, was our intention in filing the Rule 60B motion was to get permission to do discovery on this question, to consult with experts and to litigate this issue. But as we stand here today we have not done that. That's true. You started to say earlier that you had an agreement with the district attorney about the blood? Yes. What is that? Yes, Your Honor. Mr. Parnes went to Blackfoot, met with the prosecuting attorney for Bingham County, and looked at the evidence at the Blackfoot Police Department. And it wasn't a written agreement. It wasn't something that was signed or formalized in any way. It was just, yeah, absolutely, let the chips fall where they may. Sure, yeah, we'll agree. Just put your stuff together and we'll get it done sort of thing. And we took it that there was not really an issue. But then once matters moved a little further it became an issue, and there was a refusal to allow us to do that. We had a lab in Salt Lake, a certified lab that was prepared to do the testing, and we had funding from Judge Windmill, as we know, to do this all at no expense to the state, and the agreement was withdrawn. We would have been, Mr. Parnes and I were reflecting yesterday that we would have had the results of this testing back about a week ago had the state followed through on its agreement, and we would have been considerably farther down the road even now as we argued before the court. So the result of all of this. One final question about the blood evidence, and then you can go into the instructions I take. Yes. There was other blood evidence, I mean other places in the room where Mr., what is presumptively or not proven, Mr. Levitt's blood was found, right? Yes. Several different places. Yes. So for his story to have been true, it would have to have been true that this nosebleed not only had left blood on this woman's clothes, but also in several different places in the room. I think there were five or six articles of clothing, and there was a spot on a wall. More than one. Maybe one in the door, one in the wall, something like that. Yes, I believe that's true, Your Honor. I think that correctly states the record. All right. Yes. Instructions. The instructions are, this is a matter that's been before the court before, and I know the court's familiar with it, and we present it here in a slightly different way, in a slightly different context. Our point here is that trial counsel should not have permitted the jury, Half the courts at the time were allowing this instruction. I don't believe it. Not in the Ninth Circuit, Your Honor. The Ninth Circuit had ruled clearly that this instruction was not appropriate, was not permissible. I recognize not as a matter of constitutional law, but that had occurred 30 years previous, and there was an intervening Ninth Circuit opinion as well. There are state courts that gave it, and there are federal courts in other places that gave it. I mean, this was not a clearly wrong instruction at the time. I understand what the court is saying, but I respectfully disagree. On its face, the instruction, referring now to Instruction 12, takes the requirement for proof beyond a reasonable doubt and just turns it upside down. It says it doesn't apply to someone who's guilty in fact, and at the same time we're telling this jury that the facts don't have to be proved beyond a reasonable doubt. Well, you have to make a clear case of ineffective assistance of counsel, not just an arguable case, a clear case of ineffective assistance of counsel for failing to object to the instruction. I just have a hard time figuring out how that can be the case, possibly the case when other courts are giving that instruction. It's not been repudiated by the Supreme Court or held by our court to be a constitutional violation. No, but I understand they're not a constitutional violation, but it was held by this Court to be an improper instruction. In federal court. I'm sorry? In federal court. Yes, that's correct. That's correct. And I mean, Your Honor, on its face, the instruction, this Court agreed the instruction was incorrect, and there's no defeat. But the question is not whether the instruction is incorrect with the benefit of hindsight. The question is whether it is ineffective assistance of counsel to object to it when other courts are saying it's okay. It wasn't something that sort of made up on the spot. That's an outlier. It was not an outlier. Well, I mean, I perhaps would quarrel with the Court about half of the courts. I don't believe it was half. And I don't remember, as I sit here, how the matrix, stand here, how the matrix. A substantial number of courts. It was not just one or two. I don't believe that's true, Your Honor. Also, after the opinion in this case in Rhodes, this Court held that the instruction, although erroneous, was not, did not, in the context of the instructions as a whole in that case, did not create a problem as to reasonable doubt. And at least some of the instructions were the same. And, in fact, this Court has gone through the rest of the instructions, leaving aside the alibi one for a moment, and said they were okay. So the only difference between, am I right that the only difference between Rhodes and this case is the alibi instruction? Well, there's also the, we have a special application of the proof of facts instruction that I think no court has ever addressed. How is that? Well, my point is that this instruction says the requirement for proof beyond a reasonable doubt doesn't apply to somebody who's, in fact, guilty. Right. And at the same time, we say facts don't have to be proved beyond a reasonable doubt. But weren't both those things true in Rhodes? Those things were both true in Rhodes. I just simply mean the argument was not addressed and was apparently not raised in Rhodes. And I ask this Court to consider that. But, Your Honor, I will also say I think that the Rhodes case is a different case. It's not a circumstantial evidence case. It's one that presents a separate factual predicate. I cannot tell you that the instructions are exactly the same. I just respectfully say that if we're talking about a trial counsel, a person in the position of trial counsel, that it was error not to object to that instruction. And there's no conceivable justification. That instruction does nothing for the defendant. It cannot have been a tactical choice to leave that instruction before the jury. It turns the requirement from the case. Counsel sometimes makes tactical choices not to fight about things, not to fight about everything because there are so many things that are more important to fight about that you don't want to lose your credibility or waste the Court's time by raising objections you know are going to fail. That's a tactical choice in itself. You might prefer not to have it in. You may decide it's hopeless and I'll focus on the things that matter. That's a tactical choice too, isn't it? Well, Your Honor, if you're talking about arguing that the flag is on the wrong side of the courtroom or something, yeah, I get that. But this is structural error, according to Sullivan. Fiddling with the requirement for proof beyond a reasonable doubt goes to the fundamental way that criminal justice is structured in the United States. And this sharply diminished in the jury's mind the requirement for proof beyond a reasonable doubt. There is absolutely no reason to have acquiescence. But we've held it's not a constitutional error, right? I'm sorry? We've held it's not a constitutional error. We've held, as Judge Berza points out, we've held it was not a constitutional error. Are you referring to the Reynolds case? Reynolds. But you didn't hold it was not a constitutional error. You held that in context it wasn't. That's what I understood and that there was a Teague issue. I understood that, at least in Levitt's case, that the court didn't reach the constitutionality of Instruction 12. And in Reynolds it was a federal prosecution. But in Rhodes, Rhodes. Yes, ma'am. Did Rhodes hold that it was unconstitutional or that the instruction itself was constitutional or unconstitutional, that it didn't decide that, and it just looked at the whole set of instructions? Which one was it? Well, my understanding is that the court in Rhodes said, as this Court did, that the instruction's wrong. Wrong, meaning unconstitutional. And I can't answer the question off the top of my head. But then the court said in the context of all of these instructions, you – in the context of all of these instructions, there's not a reasonable likelihood that the jury understood that it could convict on a standard less than beyond a reasonable doubt. In other words, the Teague standard. And – but my point is, my point is that there's no reason for trial counsel to agree to these instructions. You get nothing. And you're tinkering with the fundamental skeleton of the way criminal justice works in the country. One other problem is that my understanding is that Judge Windmull doesn't think he ever raised this claim. Right? Is that right? Yes. He's in federal court, in the federal agencies. Yes. What about that? He thinks – and he certainly has some justification in the wording of that particular part of Claim 9 seemed to focus on appellate and post-conviction counsel and not the trial counsel. And I'm familiar with what the Court's referring to, and I'm sure the Court has read our position on this. And I took Judge Windmull to be saying, in any event, I'm going to reach the merits of this question and I'm going to rule against you on the merits. But respectfully, I think we did raise it. I acknowledge that it could have been raised with better clarity, but we incorporated Claim 11, which clearly referred to trial counsel. And to the extent there was any doubt about it, we spoke to it in the traverse as well and made it clear that it referred to trial counsel. And so I guess our position was that a fair reading of the petition and the traverse and all of the pleadings was that it was raised. So, Your Honor, I guess where we find ourselves is that there's a claim for ineffective assistance of counsel. We raised it in 1996 – we raised it in 1993, excuse me. And we were defaulted on it. So we never got an opportunity to develop it or to do discovery on it or to present it in an orderly, sensible way. In March, the U.S. Supreme Court makes a radical change to quote Justice Scalia in this area of the law and says, you know, you can raise the proposition that errors of post-conviction counsel is cause. And so now what happens is almost within – in a very short period of time, we get a mandate back from this court. And within 24 hours, the state is obtaining a new death warrant. And as soon as the state obtains a new death warrant, this becomes a matter of the 11th hour. And it now becomes – now the state has the argument that we're raising this issue at the 11th hour, even though there's no requirement in the Idaho statute that the state move at any particular time to get a warrant. And, in fact, the state waited 20 years to get a warrant in this case. So now suddenly we're under this impending pressure. And this court has accommodated that pressure, and we have tried to – we're producing briefs on tight schedules, and we know the court is considering these issues on that basis as well, but we are never getting a chance to develop these issues in an orderly way. And if we could just turn the clock back to 1996, and if Judge Windmill had said, motion regarding procedural default denied, now let's talk about where we go from here. Well, we would have been in a position then of doing some discovery and presenting this issue in an orderly fashion. And that's all we're really asking, is before we execute this man – he's been on death row for 28 years. His non-execution has not caused any serious problems in the universe. Couldn't we wait for another 120 days and do this right? And that really is the kind of the sum and substance of why we've come here. Okay. We'll just save your time. Good. Thank you. We'll hear from the State. Thank you, Mr. Chief Judge, and may it please the Court. I need to update the Court on recent events over the last 24 hours. While I was on an airplane yesterday – actually, yesterday morning before I got on the airplane, the Idaho Commission of Pardons and Paroles denied Mr. Levitt's request for commutation. While I was on an airplane, there was a petition for writ of mandamus filed with the Idaho Supreme Court by Mr. Levitt. Our response was filed by my colleagues by 8 o'clock this morning. The reason that is important is because, as I understand Mr. Levitt's request for testing, it has to do primarily with the commutation proceedings. And it appears to me that those proceedings are over outside of the Supreme Court, and I suspect today we'll have an order denying that petition for a writ of mandamus. I know that's presumptive on my part, but I don't believe that there's a basis there. But the bottom line on it is – Just so I'm clear. Yes. A writ of mandamus of whom to do what? It would – as I understand the petition, and I don't have a copy of it, but it's to the Idaho Pardons and Paroles to have a hearing on the commutation, because there was no hearing pursuant to Idaho law. The parole board was not required to have a hearing. They were required to review the submission. They made a determination apparently Tuesday night based upon that submission not to have a hearing. And as I understand it, Mr. Levitt's mandamus petition is saying that they have to have a hearing. And is the commission the last stage in the clemency process? That is correct, Your Honor. The governor can't be appealed to personally to exercise executive clemency? Actually, Your Honor, that's an interesting question, because the Idaho Constitution – I wish I could remember which specific section – says it's up to the – You don't have to remember by heart to remember the body? It says it's up to what? I'm sorry? It says it's up to whom? It says it's up to the commission. And if the commission denies it, that's the end of it. If the commission recommends it, then the governor has an option. Now, the problem that I have is that Idaho code seems to say that the governor may have some power to commute irrespective of the commission's decision. And I know that there was a case some years ago, Donald Paradis, where Governor Batt at that time commuted the sentence even though – the commission was two to one, not two. But in Idaho, just like federal courts, the Idaho Constitution reigns supreme over the statutes. The bottom line for what you're saying is that it's not clear whether the request is moved. Probably not, but you can't, as you stand there, tell us for sure that they couldn't make a petition to the governor in the exercise of his historical power as a king's representative. Yes, Your Honor. Going back to King John, right, that there wasn't some reserve power for him to commute. So technically it's not – the request is not entirely moved. Very technically, you're absolutely correct, Your Honor. But I think that, as I said, we'll have that decision. But that brings me to the question of the 60B motion, which is ineffective assistance of counsel. And counsel's correct in that his motion for access to this evidence does tie in a little bit, at least, with the 60B motion. The problem that I have with the request for access is that we don't know what kind of testing is going to be done. Now, it's alluded to that it's DNA testing. Just let me understand this. If this is the police department, is it county police? What kind of – it's an arm of the state? I think that's fair to state, Your Honor. It's a local police department. In Idaho, we have the county sheriff's department, and then we have a city police department. Why didn't you just tell them to turn it over? Because that's the local prosecutor's decision. We have, at the Attorney General's office, very limited power to intervene in local prosecutor's actions. You should have picked up the phone and said, hey guys, turn it over, they'd do it. Actually, Judge Kuczynski, I did that, and Mr. Andrews is adamant that that material not be released. Now, he's the county prosecutor. I'm sorry, Your Honor. And I realize that counsel has alluded to a conversation that they had that's, of course, not part of the record, but I've had conversations with the county prosecutor, and he says no such agreement has ever been reached, and that he's not wanting to release that. And actually, in fairness, I have to back up. He's not opposing it, but he's leaving it to the discretion, excuse me, of the local police chief, the Blackfoot police chief. That's actually, I think, in a letter that is part of the record. And it's the local police chief that says, I'm not releasing this stuff. Is there any state proceeding? Is this a very strange way to proceed? I mean, this is a momentous decision. It could be. I mean, who knows? Maybe you could, if this thing was looked at, it would turn out, and it has just happened, that somebody else's DNA is on there. And actually, Your Honor, there is a state procedure. And that was 1949-02. And that particular statute was enacted, I believe it was in 2001, and it allowed for testing. But in very narrow circumstances, I gather. Oh, no, Your Honor. I don't believe it. If you just could have come in in 2001 and said, I want to do this testing, you would have been allowed to do it? I think you have to make some kind of showing under 1949-02. But I know that I've had other capital cases where the showing has been pretty de minimis. And that testing has been allowed. At that point, it's not up to the local police chief. I'm sorry? At that point, it's not up to the local police chief. No, Your Honor, it's up to the district judge, state district judge. And that's one of the problems that I have with this case, is that when that statute was enacted, there was no attempt whatsoever by Mr. Lovett to do that. What was the state of the case at that point? One of the oddities of this case is that at least twice, there was habeas granted. Not at least twice, twice. There was habeas granted by the district court. So at the time that the time would have run under that statute, was there a new trial order? I mean, was the habeas grant still in effect? The habeas had been granted by Judge Windmill on the guilt phase. That is correct. Why did they want to have to start retesting things at that point? The problem was, Your Honor, is that Judge Windmill entered a stay. And, in fact, the trial had actually been set by the state district judge. There was, as I understand it, a discovery request that had been made by the defense, different defense attorneys, of course. And then Judge Windmill entered the stay of his order and said, you don't have to retry it because the state is going to take this to the Idaho Supreme Court. So at that time, Lovett was put back. The Idaho Supreme Court? Excuse me, the Ninth Circuit. My apologies, Your Honor. So at that time, Lovett was put back in the position that he was before Judge Windmill entered his stay. And he could have gone to the state district court and asked for the DNA testing. And what's interesting about that is that I know that Lovett has talked about the fact that, well, we didn't want to do that testing, et cetera, et cetera, because of the order, Judge Windmill's order saying you have to retry, but there had been a stay entered. And more importantly, in 2002, Ring v. Arizona was issued. And within 42 days of, within a short period of time of Ring being issued, Lovett filed a successive state post-conviction petition. So my question has to become, if you filed a successive state post-conviction petition based upon Ring, why in the world didn't you file the post-conviction petition based upon 1949-02 asking for DNA testing? And we don't have an answer to that. It just wasn't done. And particularly if you read Osborne from the United States. Sounds like another Martinez fan, doesn't it? Interestingly enough, Judge Kuczynski, I thought about that last night as I was laying in my hotel room. As to, yes, there's an issue there. The question becomes, of course, is that there was no post-conviction case filed whatsoever as far as the 1949-02 issue or the DNA testing. So what about the merits of the 6GB? Yes, Your Honor. Of course, we have the question of whether as far as, let's talk about the serology first, Your Honor, instead of the jury instructions. The problem that I have with this is that this mixing versus overlay thing is based upon one specific part of Anne Bradley's testimony. Yes, Your Honor. Can I ask you to back up a little? Tell me what you think is the current state of what's defaulted, what wasn't defaulted. In other words, if this is what I'm now understanding or trying to understand. Judge Windmill held the whole trial counsel IAC defaulted. Is that right? I don't believe in its entirety, and I wish I could read it. But now he says, I overdid it. Yes, Your Honor. And I think that's based upon this Court's decision. And, in fact, there was a hearing in state court about trial counsel IAC. There was a hearing in state court, yes, Your Honor. But, in fact, because he treated it as a defaulted, the petitioner is right that they never got to develop anything about this. I think that's a fair statement, Your Honor. So it then gets to this Court, and this Court says, you're wrong, it wasn't defaulted. But instead of saying, so go back and now you can develop the evidence and find out whether, for example, there was other serology evidence that could have been introduced, quite aside from this Bradley thing. I don't know if that's true in the Ninth Circuit. Your Honor, the briefing on the blood evidence, and, in fact, I just looked at my brief. I didn't look at the petitioner's brief. But the briefing in front of this Court in what I've called Levitt III was based upon the handling of the evidence. It was not an IAC claim. So, essentially, the footnote 42, it hadn't been briefed and hadn't been litigated, to be fair. To be fair, I think that's a fair reading, Your Honor, as I've looked at the briefs. But I don't think there's anything wrong with that. And the reason I say that is, and it does go, in fact, to Anne Bradley's testimony, and it goes to Mr. Kohler's post-conviction testimony. From page 606 of the excerpts of records, Anne Bradley is initially talking about the lavender panties and the testing that was completed. And then she's asked the question, would that be similar for finding maybe with the lavender panties that you had some readings for A? And she says, well, on the lavender panties, I clearly had A-type sweat in the blanks. And that was not the case here. So I felt rather than it being a factor from the sweat, that it could have been a mixture of blood type B themselves. And in that, when she says could, she's talking about the brown corduroy shorts. That's the entirety. Yes, but it was made a big deal out of in the closing argument. I don't doubt it at all, Your Honor, but the bottom line is that she's – This is not a strong case. Is it a particularly strong case overall? It's a circumstantial case. It's unquestionably a circumstantial case. But respectfully, I disagree. I think it's a very strong case when you look at the entirety of the blood evidence. And that whole thing, as far as the mixture versus the overlay, the prosecutor comes back in the very next line and says a mixture of blood type themselves, okay. So it's really the prosecutor that's getting the words in that he wants as opposed to Ann Bradley. Now you look at the word could, which is a very equivocal word, very jello-y. And then you compare that with Mr. Kohler or actually Dr. Blake's report. And, of course, his report is still not part of the record in this case. Apparently counsel has made a tactical decision not to provide anybody, including this court, with the entirety of that report. I think that's significant, and I'll tell you why in a minute. But if you look at the testimony from Kohler, he uses, he being Dr. Blake, uses the word may. There may be a mixture or an overlay as opposed to a mixture. So you've got a situation here where Levitt is contending they should have brought in Dr. Blake to talk about something Ann Bradley said could exist when the best Dr. Blake says may exist. That's not very strong when you consider the fact that the rest of Dr. Blake's report and testimony was apparently going to corroborate everything else that Ann Bradley said. The other thing he's saying, although it's vague and hasn't been substantiated yet, is that there should have been other serology, leaving Dr. Blake aside, that he should have done more serology work. But no one's yet told us what it would have shown. I don't know what that serology work would have been. And as this court said in Levitt 4, at least as to the mental health evidence, you get one expert. You don't get half a dozen. You don't get to go out and find the one that's going to say what you want them to say. You get one. They got their one. They got Dr. Blake. At the time of the trial, was DNA evidence available? And that's what I want to bring up next, Your Honor, is because that again ties in with their request for testing. Their request for testing, although somewhat vague, I think is for DNA testing. DNA testing didn't exist in 1985, at least in the record that we have. So the testing that they want to do to support their ineffective assistance of counsel is completely irrelevant. Because you have to go back to 1985 at the time of the trial, of course, and understand what was available as far as serological testing. And it was the ABL type testing, the old stuff that we, I call it the old stuff that we used to have, long before DNA. But that's not what they want to do. So why do we have to turn over the evidence anyway? Unless it's, as Judge Kaczynski said, just to find out, is it really him? But that's, of course, not the test that we have to follow, even under Osborne. Just as a side note, I know that counsel has, and Judge Berzon, you've mentioned it too, the prosecutor's closing argument and his focusing upon the mixture of blood on the corduroy shorts. But I think it's important also to focus upon the prosecutor's argument at the time of post-conviction. And this is found on page 565 of the excerpts. As the attorney for the state, Mr. Marcos and I would have been delighted had the defense called Dr. Blake as a witness. We looked forward to Dr. Blake arriving at this trial, so we would be allowed cross-examination to put the frosting on the cake. I have no doubt that if Dr. Blake had actually been called by trial counsel, that the ineffective assistance of counsel claim that we would have before this court would be trial counsel's having called Dr. Blake because of the cross-examination that would have taken place and the frosting on the cake that would have been provided to the state in convicting Richard Levitt. This is not a substantial claim that warrants remanding this case pursuant to a 60B motion. As to the jury instructions- It's a fairly low-level standard in terms of substantial meaning the opposite of not insubstantial. I mean, it's close to sort of not frivolous. It didn't seem to be requiring much of a showing. And one can see, I think our later cases in the last couple months have not necessarily been reading it that way. And that makes some sense if you think about it in terms of if there were something more- if, for example, they had come in in this case and come in with a serology report that would have- that contradicted the earlier ones, and then Judge Windmill had said, no, it's procedurally defaulted, there's no way to make any judgment about something that didn't happen very much. I mean, when something was defaulted early on, you just don't have a content to make much of a decision about substantiality. So it has to be a pretty weak standard. Well, Your Honor, I respectfully disagree. Because Justice Kennedy in writing Martinez used the word substantially as opposed to just- he used substantially- a substantial claim of ineffective assistance of counsel as opposed to just the generic ineffective assistance of counsel. So I would submit to the Court that it's actually a higher claim, not a low standard, but a higher claim. Otherwise there's no reason for him to use the word substantial. So I would submit that it is not a low threshold by any stretch of the imagination. And I do want to- I know I was going to leave the serology, but I do want to note that there's been a lot of talk about mixture versus overlay. I'm not sure I understand the difference. And that's one of the problems with this case, is that even before procedural default, throughout post-conviction in state court, both in terms of what Mr. Parmenter did and in terms of what was not done and as far as filing a 1949-02 action, there's no affidavit saying there's a difference between mixture versus overlay. As you mentioned, Chief Justice Kuczynski, what's the time frame for that? And that doesn't require sending evidence off to be tested to get that kind of an affidavit. That kind of an affidavit could have been done very quickly, and yet we have a cold record with no affidavits from any expert whatsoever. I simply don't understand how there can be prejudice when the petitioner hasn't provided the necessary evidence to support that claim. As to the jury instruction, I think the court understands what that is. I agree with counsel that in Levitt 3, instruction 12 was Teague-barred, but it certainly wasn't Teague-barred in Rhodes. And the instructions given in Rhodes were virtually identical, except as to the alibi instruction, as the instructions that were given in Levitt. There's no constitutional violation as a result of instruction 12. It's not a good instruction. I acknowledge that. But as you mentioned, Chief Justice Kuczynski, in 1985 there were substantial, I would say it was substantial, jurisdictions, both state and federal, that were allowing that instruction to be used. Well, is that a measure of ineffective assistance, i.e. it's okay to not raise an issue as long as there's contrary support? If it's not non-meritorious? Yes, Your Honor. And the reason that I say that is because there's a lot of decisions that have to be made, as this Court well knows, by a trial occurring, as you go through what Mr. Kohler described as a very complex trial. Now, I know in front of Judge Windell I noted that we had that instruction given in this case. We had it given in Rhodes. Rhodes was an eastern Idaho case out of Idaho Falls in Bingham County. Bingham County is the same county as this Court. And there was another case that this Court has never seen, that was Randy McKinney, where the instruction was given. And my argument was that at that time in eastern Idaho, this instruction was kind of routine as I understand it. And so there was no reason really for counsel to question it. It wasn't reasonably objective. It was not unreasonably objective to not object to that instruction because nobody had really challenged it at that point in time. Yes, the Ninth Circuit has said as early as, I believe, 1957 in Reynolds that it was a bad instruction. But as this Court indicated, Idaho is not required to follow all of the decisions of the Ninth Circuit. Do you read Rhodes as having determined now finally that it's actually an unconstitutional instruction? No, I do not, Your Honor. And the reason I say that is because if you read Rhodes ñ Well, they said they disapprove it. And on what ground could you disapprove something in a habeas unless it's unconstitutional? Because you have to look at the ñ you can't look at that instruction in isolation. Well, it did ultimately decide that in context as a whole it wasn't ñ I guess they decided it wasn't prejudicial as a whole, it didn't deprive them of a fair trial. But as to whether the instruction itself is unconstitutional ñ I'm not willing to go that far, Your Honor, because as I read Rhodes, you have to look at the instructions collectively to determine collectively whether that is ñ All right. Then there is one major difference here, which is the alibi instruction. And that is correct. And the alibi instruction was determined in the last Ninth Circuit opinion ñ no, the one before that, I guess. It would have been Rhodes 3, Your Honor. Right. Excuse me, Levitt 3. Right. And what did it hold? I'm sorry? And what did it hold? It was a bad instruction. Right.  And as I read that ñ The alibi was ñ I wasn't there when they said I was. I was there a week before. And I was home watching TV. Now, it's true it wasn't a corroborated alibi, but it was an alibi. Well, as I read ñ and now I have lost it. As I read that ñ the Court's opinion as to that particular instruction ñ if I could have just a moment, Your Honor. That's Instruction 39. And the Court said it was certainly troublesome. And I agree with that because the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. There was no question that Levitt had to be at Elk's house on the evening of July 17th to commit the crime. And then the Court went on and in context with Instruction 12, said that it wouldn't be a particular problem on page 823 of that particular problem. I don't dispute that that alibi instruction shouldn't have been given. But that doesn't change the fact that what we're talking about here is ineffective assistance of counsel. We're not talking even about a substantive due process claim as to Instruction 12. But in fact, wasn't it the alibi instruction that the trial counsel suggested? I'm sorry, Your Honor. I don't ñ my memory's not that good. I don't remember. There was a whole dispute about invited error. Wasn't it around that instruction? I'm not sure either. I know that there was an invited error issue. But I'm sorry, Your Honor. I can't remember which particular instruction it was. The bottom line on this case, though, is that Judge Windmill's opinion is really shielded by three levels of deference. Number one, this is a 6dB motion. It's discretionary. What did he abuse? His discretion. Secondly, the Strickland standard for trial counsel. That's a pretty high standard, according to Padilla. And thirdly, you have ineffective assistance of post-conviction counsel. And as I've discussed in my brief, the ineffective assistance of post-conviction counsel appears to be akin to ineffective assistance of appellate counsel. And those are even harder claims to prevail on as a petitioner than ineffective assistance of trial counsel claims. When you look at those three levels of, I'll call them protection, for Judge Windmill's decision, we would submit that there was no abuse of discretion in this case in denying the 6dB motion, and that the district court's decision should be affirmed, unless there are additional questions. Thank you, Your Honor. Thank you. We have some time left, so Bob. Thank you, Your Honor. This Court previously, addressing the alibi instruction, said this. Instruction 39 is more troublesome. That's the alibi instruction. It's more troublesome because it imposed the burden of proving an alibi on Levitt, which is clearly wrong, and citing a Ninth Circuit opinion from 1954, which in turn cites cases from six other circuits to this effect. So we have a situation where instruction number 12 is telling the jury that this, that the requirement for proof beyond a reasonable doubt doesn't apply to somebody who's guilty in fact. And we have an instruction saying the facts don't have to be proved beyond a reasonable doubt. And we have an instruction that says that Mr. Levitt has the burden of proving that his defense, which is alibi. Well, it didn't say that. It said he has a burden of proving that there was a reasonable doubt. Instruction 39. The alibi instruction. The alibi instruction imposed the burden of proving the alibi on Mr. Levitt. To the degree of proving that there was a reasonable doubt.  In other words. Only to that degree. Yes, Your Honor. Right. And we have Mr. Levitt questioned over, cross-examined over his silence, his decision to remain silent and consulting with counsel. We have the prosecution telling him that, telling the jury that he's hiding behind the decisions of his lawyers. We have the admission of a knife in a sexual, unrelated sexual incident that this Court decided was error but decided was harmless. Can I go back to the alibi thing for a minute? Yes, Your Honor. Was that the instruction that was in fact suggested by the trial counsel? Yes. And I believe that the State argued this to Judge Windmill. And Judge Windmill accepted this, that it was invited error. So this, I'm quite sure, although I can't cite the Court to the precise place in the record, that this was a matter of trial counsel's. So it's really not just a question of the trial counsel not having objected. If the trial counsel hadn't suggested this instruction, it may never have been there at all. Right. It's a separate matter with respect to the blood. So, Your Honor, I respectfully submit that this was not a strong case on the part of the State. I think that there was, that there is a reasonable likelihood that if these minimal kinds of protections, if the minimal effort had been made to deliver the kinds of protections that are required by the law, there could have been a different result. I will say that Dr. Bradley's report was an exhibit at the, was Exhibit 6 at the Post-Conviction Relief Proceeding, April 23rd of 1987. And I believe that that is, I don't think it was included in our excerpts, but I'm quite confident that it is in the record. Your Honor, Judge Berzon, you spoke to the question of the Martinez Standard, and it is simply that there is some merit. That's all. And I submit that this has to do with the fact that we never got a chance to go forward on this issue on day one, and that if Judge Windmill had not. I must say that what I'm having the biggest trouble with, in some ways, with regard to the serology is that you've never put any, you know, in 30 years, any declaration in from anybody about the serology issue in terms of whether it has any merit, whether there's something else that should. Leaving aside this question of whether Bradley himself should have been put on, I mean, either in terms of what Bradley's evidence meant, or what Blake's evidence meant, or what else could have been done, or anything, right? To this day, we have nothing. Well, I understand the reference to it being a Martinez claim, and I. I mean, even on the Martinez level, I mean, how can we tell whether. I mean, in order to be substantial, it had to have had some possible prejudicial impact, and we don't have a clue. Well, I think. I guess what I would say, Your Honor, is this. This is what we wanted to develop. Well, but you could have developed it. I mean, you could have, even in the last month, to look at the Blake report and the Bradley report and say what the art of the possible was in 1985 and later, and why this was all inadequate, and you've done nothing, which certainly makes one think that there may be nothing to do. Well, I mean, we were in the. We are in the. I would say we are in the process of doing this, and we have been really, I think, largely overtaken by events with the state obtaining the death warrant, and we just have not had an opportunity to run this to its logical conclusion and to try to present exactly the kind of evidence that the court is talking about. Is there still state proceeding regarding the issuance of the warrant or is that over? There was a proceeding of some kind going on challenging that. What happened to that? That was appealed to the Idaho Supreme Court, and the Idaho Supreme Court yesterday or the day before found no error in it. I see. Okay. So there remains the question of a cert petition on that claim, but it's no longer being litigated in the Idaho state courts. Unless there are additional questions, I've concluded. Okay. Thank you. Okay. These cases are submitted.
judges: Kozinski, Reinhardt, Berzon